UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DANCE THEATRE OF HARLEM, INC.,

Plaintiff,

v.

CHROMADIVERSE, INC.; JUDY TYRUS; HARRIETT GILBERT; and SHERRY GAGNON,

and

All photographs, negatives, and related archival material created by Margaret Elizabeth Schnare for Dance Theatre of Harlem and located at 466 West 152nd Street, New York, New York, *in rem*.

Defendants.

No.  25-CV-2978 (RA)

OPINION AND ORDER

---

RONNIE ABRAMS, United States District Judge:

Plaintiff Dance Theatre of Harlem, Inc. ("DTH") brings this case against Defendants ChromaDiverse, Inc. ("ChromaDiverse"), Judy Tyrus, Harriett Gilbert, and Sherry Gagnon.[1]  It seeks a declaration of its ownership in a set of photographs, both digital and physical, that allegedly make up the bulk of DTH's historical archive.  DTH also brings claims for injurious falsehood against ChromaDiverse, Tyrus, Gilbert, and Gagnon.

Before the Court is Defendants' motion to transfer, stay, or dismiss this case for lack of personal jurisdiction and for failure to state a claim.  *See* Dkt. No. 21 (Defs.' Mot.); Dkt. No. 25 (Defs.' Br.).  The Court held oral argument on Defendants' motion on January 5, 2026, at which time

---

[1] DTH also names certain property, "[a]ll photographs, negatives, and related archival material created by Margaret Elizabeth Schnare for Dance Theatre of Harlem and located at 466 West 152nd Street, New York, New York," as an *in rem* Defendant.  Defendants do not bring a motion to dismiss on behalf of that property.

Defendants informed the Court that they no longer intended to pursue transfer, stay or dismissal of ChromaDiverse on the basis of personal jurisdiction. Thus remaining before the Court is Defendants' motion to dismiss (a) Tyrus, Gilbert, and Gagnon for lack of personal jurisdiction, (b) the declaratory judgment counts against Gilbert and Gagnon, and (c) the injurious falsehood counts against Tyrus, Gilbert, and Gagnon. For the reasons stated below, the motion is granted in part and denied in part. The Court denies the motion to dismiss Tyrus for lack of personal jurisdiction, but grants it as to Gagnon and Gilbert. The injurious falsehood claim against Tyrus and ChromaDiverse is dismissed for failure to state a claim.[2]

## BACKGROUND

This case concerns ownership of the photographic archive—both digital and physical—of DTH, referred to in the Complaint and the parties' briefing as either the "DTH Archive" or the "Marbeth Collection," and which the Court will generally refer to as the Marbeth Collection. ChromaDiverse and DTH are already embroiled in litigation concerning the Marbeth Collection in a California state court, but now DTH brings this action as well.[3]

### I.     Marbeth Schnare Photographs DTH's Early Years

DTH, a New York-based non-profit corporation, was founded in 1969, at the height of the Civil Rights movement, "on the principle of centering people of color in ballet and the performing arts." Dkt. 1 ("Compl.") ¶¶ 1, 6, 21. The organization provides ballet training and "performance opportunities" for dancers. *Id.* ¶ 21.

At its inception, DTH hired the photographer Margaret Elizabeth Schnare, who went by Marbeth Schnare, to document the organization's activities and work. *Id.* ¶ 2. Schnare's work would

---

[2] In their motion, Defendants also sought dismissal of the declaratory judgment claims (Counts I through III) as to Tyrus. On August 7, 2025, however, DTH moved to voluntarily dismiss those claims against Tyrus, Dkt. No. 44 (notice of voluntary dismissal), to which Defendants consented. *See* Dkt. No. 49 (order seeking Defendants' position on dismissal of declaratory judgment claims against Tyrus); Dkt. No. 53 (Defendants' notice of non-objection).

[3] The Court draws the following facts from the Complaint, documents incorporated thereto, and other court documents over which the court takes judicial notice, accepting "well-pleaded factual allegations" as true for purposes of resolution of the pending motion to dismiss. *Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020).

come to represent "the lion's share of DTH's historical archives of its earliest years." *Id.* ¶ 33. Collectively, this work constitutes the Marbeth Collection. DTH's founder, Arthur Mitchell, "closely supervised" and "directed" Schnare, allowing her full access to DTH both in rehearsals and on tour. *Id.* ¶ 23. Schnare was paid for her work, and her travel costs in photographing DTH activities were covered by the organization. *Id.* ¶ 24.

Schnare photographed DTH activities for many years, although most of her work for DTH occurred between 1969 and 1975. *Id.* ¶ 25. DTH has long used Schnare's photographs for its own purposes, including marketing and publicity, and retained physical copies of "many" of Schnare's DTH photographs in its Harlem office. *Id.* ¶¶ 26–29. Not all of the photos, however, were in DTH's physical possession: Schnare stored a "supplemental collection" of photographs and related materials in her home throughout the remainder of her lifetime. *Id.* ¶¶ 30–31. Whenever DTH sought to use Schnare's personally stored materials, she would allow them to do so. *Id.*

## II.    Schnare Passes Away and DTH Comes to Possess the Remaining Photographs in her Collection

Schnare died in August 2006, naming two of her relatives, Gloria Euler and Defendant Harriett Gilbert, as executors of her estate.[4] *Id.* ¶¶ 37–38. Schnare's will did not mention any portion of the Marbeth Collection—neither the photographs stored at DTH, nor those in her apartment. *Id.* ¶ 39.

Shortly after Schnare's death, Doris Fiotakis, a friend of Schnare's, went to Schnare's apartment, apparently to distribute her belongings. *Id.* ¶ 40. Fiotakis, not a party to this action, was joined by Euler and Euler's daughter, Defendant Sherry Gagnon. *Id.* According to DTH, Euler and Fiotakis agreed, with Gagnon in attendance, on how to deal with the portions of the Marbeth Collection stored in Schnare's apartment: Fiotakis would take possession of the materials, and would later deliver them to DTH. *Id.* ¶ 41. DTH further alleges that this plan was "consistent . . . with DTH's and Schare's

---

[4] Gilbert renounced her right to act as an executor of Schnare's estate, though Euler remained an executor. Compl. ¶ 40.

3

[sic] words and actions during Schare's [sic] lifetime, and with Fiotakis's understanding of Schnare's own view of and wishes as to" the Marbeth Collection. *Id.* ¶¶ 40–42. According to DTH, Euler, Gilbert, and Gagnon "endorsed and facilitated this plan," and none of them asserted ownership, either on their part or on Schnare's, of any portion of the Marbeth Collection stored in Schnare's apartment. *Id.* ¶ 42. Accordingly, Fiotakis took possession of the Marbeth Collection materials in Schnare's apartment and delivered them to her home in Connecticut, where she organized them. *Id.*

In September 2006, shortly after examining the items in Schnare's apartment, Euler signed an affidavit in her capacity as the sole executor of Schnare's estate, listing the items that made up that estate. While the affidavit listed "items in [Schnare's] sealed ap[artmen]t," Euler valued those items at only $1,000, and the affidavit made no mention of any DTH materials or photographs. *Id.* ¶ 44.

Two or three years later, in either 2008 or 2009, Fiotakis "invited DTH to her home" to review the DTH materials that she had taken from Schnare's apartment. *Id.* Along with other DTH employees, Defendant Judy Tyrus, a former DTH performer and, at that time, its archivist, visited Fiotakis's home to retrieve Schnare's DTH materials. *Id.* ¶ 45. Tyrus and the other DTH employees then delivered the materials to DTH, where the materials have been stored ever since as part of DTH's archive. *Id.*

### III. Tyrus Licenses the Marbeth Collection for a Book About DTH and Proceeds to Found ChromaDiverse

Throughout DTH's history, including the years since DTH took possession of the full Marbeth Collection, DTH claims that it has used its archival materials "exclusively and openly," including the materials obtained from Schnare's apartment. *Id.* ¶ 46. Among other uses, this included traveling exhibitions of the Marbeth Collection, for which DTH was compensated and which Tyrus, as the archivist, helped to organize. *Id.* ¶¶ 46–50. Tyrus's work at DTH also involved creating a digital archive of the Marbeth Collection, which included the following three credits: "Photographs by Marbeth;" "Copyright held by Dance Theatre of Harlem;" and "Curated by Judy Tyrus." *Id.* ¶ 50.

DTH alleges that on this and other occasions, Tyrus "affirmed DTH's ownership over the DTH Archive," including the Marbeth Collection, as well as DTH's ownership of "the copyrights in works that are a part of the [DTH] Archive." *Id.* ¶ 49.

At some point in the late 2010s, Tyrus left her role at DTH. *Id.* ¶¶ 50–52. She went on to found a non-profit of her own, Defendant ChromaDiverse. *Id.* ¶ 52. Even after Tyrus's departure from DTH, however, she continued to produce work relating to it. *Id.* ¶¶ 50–51. In particular, she decided to write a book about DTH's history. She sought to use DTH archival materials, including the Marbeth Collection, as part of the book, and DTH agreed. *Id.* ¶ 52. On November 4, 2019, DTH and ChromaDiverse entered into a Materials License Agreement ("MLA"), granting ChromaDiverse "non-exclusive right[s]" to use DTH materials, including DTH's photographs, "provided by DTH to [ChromaDiverse] specifically for inclusion in the [planned book]." *Id.*; *see also* Dkt. No. 22-4 (MLA).[5] The MLA specifically notes that it does not transfer rights in any of DTH's copyrighted material. Compl. ¶ 53. The MLA also states that it "contains the full and complete understanding and agreement among DTH and [ChromaDiverse] with reference to the subject matter contained herein," and "cannot be modified except by a written instrument signed by DTH and [ChromaDiverse]." MLA ¶ 11. Tyrus signed the MLA on ChromaDiverse's behalf as its CEO. *Id.* at 5. Tyrus made a similar statement in an April 2021 email to DTH, writing that "ChromaDiverse[] does not want to take ownership of the DTH archive . . . We do not want to hold any physical objects or use them for our own purposes." *Id.* ¶ 54.

Tyrus's book about DTH was published in late 2021. *Id.* ¶ 55. In the run-up to its publication, her relationship with DTH "soured." *Id.* ¶ 56. DTH apparently took issue with both the content of the

---

[5] "On a motion to dismiss, a court may properly consider documents that a complaint incorporates by reference." *Verdi v. City of New York*, 306 F. Supp. 3d 532, 541 n.4 (S.D.N.Y. 2018). DTH here incorporates by reference the MLA, quoting from it at length in the Complaint. Defendants submit it to the Court as an exhibit to their motion to dismiss.

book, and with the manner in which Tyrus dealt with DTH alumni in writing the book. Tyrus, for her part, viewed DTH as insufficiently supportive of the book. *Id.* ¶¶ 56–57.

IV.    **After Tyrus Publishes the DTH Book, Gagnon and Gilbert Purport to Gift the Marbeth Collection to ChromaDiverse**

Perhaps as a result of the falling out between Tyrus and DTH, Tyrus began to reach out to Schnare's relatives in 2021 or 2022 regarding the ownership of the Marbeth Collection photos. *Id.* ¶¶ 57–58. In 2022, Gagnon and Gilbert—who allegedly had renounced her executorship in the estate— executed a "Deed of Gift." *Id.* ¶¶ 40, 58–60; Dkt. No. 22-2 ("Deed").[6] Gilbert was one of Schnare's direct heirs, as was Gagnon's mother, Euler. Compl. ¶¶ 4, 38. In the Deed, Gilbert and Gagnon claimed to be the "sole and absolute legal owners" of the physical photographs contained in the Marbeth Collection, including sixteen boxes of photographs stored at DTH. Deed at 1, 3; Compl. ¶¶ 59–61. Gilbert and Gagnon then purported to transfer their "rights, title and interest" in the Marbeth Collection, "inclusive of all copyrights," to ChromaDiverse. *Id.* DTH alleges that the ownership rights the Deed purported to reassign included those to the physical DTH materials that were "in Schnare's apartment at the time of her death." *Id.*

The Deed was not the only document that Gilbert and Gagnon executed concerning the Marbeth Collection. They also signed a "Copyright Assignment Agreement" ("Copyright Assignment"). *Id.* ¶ 62; Dkt. No. 22-3 ("Copyright Assignment").[7] In the Copyright Assignment, Gilbert and Gagnon agreed to "irrevocably convey, transfer and assign to ChromaDiverse . . . all of [Gilbert and Gagnon's] right, title and interest in" copyrights in the Marbeth Collection materials stored at DTH. Compl. ¶ 62. As part of the Copyright Assignment, ChromaDiverse accepted the copyright interests described in the agreement as a gift. *Id.* DTH alleges that Gilbert and Gagnon knew that the

---

[6] As with the MLA, the Deed is incorporated by reference into the Complaint.

[7] Like the MLA and Deed, the Copyright Assignment is similarly incorporated by reference.

ownership of and copyright interest in the Marbeth Collection was not theirs to donate at the time they executed the Deed and Copyright Assignment.  Compl. ¶¶ 63–64.

V.    **Tyrus and ChromaDiverse Sue DTH in San Francisco, Seek Declaration of Ownership of Marbeth Collection**

In 2022, after obtaining the Deed and Copyright Assignment, ChromaDiverse, through its counsel, informed DTH that it now had "all rights in and to" the Marbeth Collection.  *Id.* ¶ 66.  ChromaDiverse sought transfer by DTH of the physical materials making up the Marbeth Collection.  *Id*.  ChromaDiverse then proceeded to file a lawsuit in California Superior Court in San Francisco, against DTH (the "San Francisco action").  *Id.* ¶ 67.  In its complaint in that action, ChromaDiverse makes a number of claims unrelated to this case, including allegations that DTH improperly disparaged ChromaDiverse and interfered with its economic relations.  Dkt. No. 22-1 (San Francisco action complaint), ¶¶ 58–62.  ChromaDiverse also alleges that DTH breached the MLA by failing to promote Tyrus's book.  In that action, ChromaDiverse sought a declaration that it owns "all rights, title and interest in and to the Marbeth Collection," as well as an injunction compelling "immediate delivery and surrender to [ChromaDiverse]" of all "Marbeth photographs" in DTH's possession.  *Id.* ¶¶ 69–72.

DTH alleges that while the San Francisco action has been pending, ChromaDiverse and Tyrus have begun to make use of the Marbeth Collection for their own economic benefit.  In particular, DTH asserts that ChromaDiverse has begun to license the Marbeth Collection to third-parties as part of its efforts to build a "digital vault."  Compl. ¶ 70.

ChromaDiverse and Tyrus's statements claiming ChromaDiverse's ownership of the Marbeth Collection allegedly went beyond the courtroom.  DTH alleges that the digital magazine *Dance Informa* "wrongly reported that Schnare's heirs had granted ChromaDiverse ownership" of the Marbeth Collection, information that DTH alleges *Dance Informa* obtained from "communications" with "Tyrus and/or ChromaDiverse."  *Id.* ¶ 72.  Tyrus also allegedly "reported the purported transaction . . . in a July 19, 2022 post on her personal Instagram account."  *Id.* ¶ 73.  And in three 2025 Instagram

7

posts of its own, ChromaDiverse posted Marbeth Collection photographs with the photograph credited to "Courtesy of ChromaDiverse." *Id.* ¶ 74.

On April 10, 2025, in an effort to obtain a declaration of its ownership interest in the Marbeth Collection, DTH filed this case. DTH seeks a declaratory judgment that it owns the copyrights to the Marbeth Collection photographs in its possession, has a non-exclusive perpetual license to copyrights in those same photographs, and has ownership rights in the physical photographs and other materials that make up the Marbeth Collection (Counts I through III). DTH also makes an injurious falsehood claim against Tyrus and ChromaDiverse for their "false statements concerning the ownership of the physical and intellectual property" constituting the Marbeth Collection (Count IV). *Id.* ¶ 98. Finally, DTH brings another injurious falsehood claim, this one against Gilbert and Gagnon for their knowing false statements regarding their ownership in the Marbeth Collection in the Deed and Copyright Assignment (Count V). *Id.* ¶¶ 102–07.

On June 5, 2025, Defendants filed the instant motion to dismiss, transfer, or stay this case. Defs.' Mot.; Defs.' Br. Among other arguments, Defendants urged this Court to refrain from ruling on the ownership of the copyright interest in the Marbeth Collection because the issue was already being litigated in the San Francisco court. Defs.' Br. at 10. On September 29, 2025, however, while Defendants' motion was pending, the San Francisco court determined that it lacks jurisdiction to adjudicate copyright ownership in the Marbeth Collection, concluding that such a determination would trample on the exclusive jurisdiction of the federal courts. *See* Dkt. No. 55-1 (Order on Jurisdiction Under the Copyright Act). The San Francisco court also ruled that it lacked personal jurisdiction over DTH, with the exception of claims related to the MLA. Dkt. No. 55-2 (Order on Personal Jurisdiction).

On January 5, 2026, the Court held oral argument on Defendants' motion to transfer, stay, or dismiss. *See* Dkt. No. 66 (Oral Arg. Tr.). At that argument, Defendants informed the Court that, in light of the San Francisco court's decisions, Defendants no longer intend to pursue a transfer, stay or

8

dismissal of ChromaDiverse on the basis of personal jurisdiction.  For the reasons set forth below, the Court now grants in part and denies in part the remainder of Defendants' motion.

## LEGAL STANDARD

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).[8]  Where there has been no discovery or evidentiary hearing, as here, a plaintiff seeking to defeat a motion to dismiss based on the lack of personal jurisdiction need only make a prima facie showing that jurisdiction exists.  *See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84-85 (2d Cir. 2013); *Sullivan v. Ringling Coll. of Art & Design, Inc.*, 2019 WL 6529823, at *2 (S.D.N.Y. Dec. 4, 2019); *Cenage Learning, Inc. v. Buckeye Books*, 531 F. Supp. 2d 596, 598-99 (S.D.N.Y. 2008).  However, "the prima facie showing must be factually supported." *DirectTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 417 (S.D.N.Y. 2010); *Yellow Page Sols., Inc. v. Bell Atl. Yellow Pages Co.*, 2001 WL 1468168, at *3 (S.D.N.Y. 2001).  Such a showing is made where the plaintiff's "own affidavits and supporting materials, contain[] an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (quoting *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001)).  "The allegations in the complaint [relating to personal jurisdiction] must be taken as true to the extent they are uncontroverted by the defendant's affidavits." *Seetransport Wiking Trader Schiffahrtsgellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993).  Nevertheless, the Court "will not draw argumentative inferences in the plaintiff's favor," nor will the Court "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013).

---

[8] Unless otherwise indicated, quotations omit all internal citations, quotation marks, footnotes, and omissions, and adopt alterations.

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action," which are "supported by mere conclusory statements, do not suffice." *Id.* In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court "constru[es] the complaint liberally, accept[s] all factual allegations in the complaint as true, and draw[s] all reasonable inferences in the plaintiff's favor," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002), although it need not "accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555. A court may consider "documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). Furthermore, "[o]n a motion to dismiss, courts may take notice of other lawsuits, judicial decisions, and litigation filings." *Ottah v. Nat'l Grid*, 2020 WL 2543105, at *4 (S.D.N.Y. Apr. 27, 2020), *R. & R. adopted*, 2020 WL 2539075 (S.D.N.Y. May 19, 2020) (collecting cases).

## DISCUSSION

### I.    Motion for Transfer or Stay

In their papers, Defendants argued that this case should be transferred to the Northern District of California or alternatively stayed pending resolution of the San Francisco action. In light of decisions from the San Francisco court, however, Defendants informed the Court at oral argument that they no longer intend to pursue their motion to transfer or stay the case. Oral Arg. Tr. at 6:16–18. This motion is thus denied as moot.

II.      **Dismissal for Lack of Personal Jurisdiction**

Defendants move for Tyrus, Gilbert, and Gagnon to be dismissed from this case for lack of personal jurisdiction.  Defendants first contend—and DTH appears to concede—that the Court may not exercise general personal jurisdiction over these individuals as none of them are New York citizens, and none maintain systematic or purposeful contacts with New York.[9]  DTH nonetheless argues that the Court has specific jurisdiction over all Defendants as a result of their conduct relating to the Marbeth Collection, which is physically in New York, as well as Schnare's estate, which was distributed there.  The Court concludes that it may exercise specific personal jurisdiction over Tyrus, but not over Gilbert or Gagnon.

Specific personal jurisdiction is analyzed under a two-step inquiry.  First, the Court must determine whether the exercise of personal jurisdiction is proper under the laws of the forum state— here, New York.  *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007).  In cases such as this, where the claims arise under federal statutes that do not contain their own jurisdictional provisions—i.e., the Copyright Act—"federal courts are to apply the personal jurisdiction rules of the forum state, provided that those rules are consistent with the requirements of Due Process."  *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 35 (2d Cir. 2010).  New York's longarm statute, Section 302 of the C.P.L.R., thus governs this Court's analysis.  *See McGraw-Hill Glob. Educ. Holdings, LLC v. Mathrani*, 295 F. Supp. 3d 404, 410 (S.D.N.Y. 2017); *Pearson Educ., Inc. v. Shi*, 525 F. Supp. 2d 551, 555 (S.D.N.Y. 2007).  In relevant part, Section 302(a) provides that a New York court may exercise personal jurisdiction over a non-domiciliary, "who in person or through an agent" does any of the following:

> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
> 2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

---

[9] There is no dispute as to whether this Court has *in rem* jurisdiction over the Marbeth Collection, and Defendants do not raise the issue in their motion.  *See* Pl.'s Opp'n at 12.

11

> 3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he
>
> > (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
> >
> > (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce[.]

C.P.L.R. § 302(a).

Second, "[e]ven if the exercise of jurisdiction is appropriate under state law," the Court must determine "whether the exercise of personal jurisdiction over the defendant comports with the Due Process Clause of the United States Constitution." *Ge Dandong v. Pinnacle Performance Ltd.*, 966 F. Supp. 2d 374, 381 (S.D.N.Y. 2013); *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 224 (2d Cir. 2014). The U.S. Constitution's guarantee of due process requires that "any jurisdictional exercise be consistent with traditional notions of fair play and substantial justice." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 625 (2d Cir. 2016).

A. **The Court Will Exercise Personal Jurisdiction Over Tyrus**

This Court will exercise specific personal jurisdiction over Tyrus, who appears to have been critical to ChromaDiverse's efforts to obtain ownership of the Marbeth Collection. The Court may do so pursuant to Section 302, New York's longarm statute.

Jurisdiction is proper over Tyrus under Section 302(a)(1) because of her long-time work for and personal involvement with DTH, a New York-based entity, as well as her engagement with and use of the Marbeth Collection, which has remained in New York throughout. Among other things, Tyrus was DTH's archivist and played a pivotal role at DTH for over two decades, including using the Marbeth Collection to organize exhibitions. Dkt. No. 22 (Tyrus Decl.) ¶ 5 (describing Tyrus's role at DTH); Compl. ¶ 48.

Her subsequent conduct while CEO of ChromaDiverse further supports jurisdiction. Under Section 302, courts may "exercise specific jurisdiction over corporate principals based on transactions

12

made or acts taken in a corporate capacity." *Wallace Church & Co. Inc. v. Wyattzier, LLC*, 2020 WL 4369850, at *6 (S.D.N.Y. July 30, 2020).  Courts applying New York law use the following test to determine whether they may exercise personal jurisdiction, pursuant to Section 302(a), over corporate executives whose New York contacts arise from work on behalf of their employer:

> In order to establish personal jurisdiction over an individual for conduct performed in a corporate capacity, a plaintiff need only establish that the principal engaged in purposeful activities in the forum state on the behalf of the corporation, with the corporation's knowledge and consent, and subject to the corporation's control. . . . At its core, this inquiry turns on whether the corporate employee was the primary actor in the transaction in New York or merely some corporate employee who played no part in it.

*Id.*  As Defendants now acknowledge, this Court may exercise personal jurisdiction over ChromaDiverse.  Its dealings in New York State, including fundraising, customer meetings, and licensing of the Marbeth Collection to New York entities, constitute the "transact[ion]" of "business within the state" of New York, thus allowing the exercise of jurisdiction under New York law. C.P.L.R. § 302(a)(1); Dkt. No. 37 (Pl.'s Opp'n) at 14.  Throughout this conduct, Tyrus was ChromaDiverse's principal and, among other things, was involved in negotiating the MLA on its behalf.[10]  She also authored the book for which ChromaDiverse licensed the Marbeth Collection via the MLA.  Dkt. No. 38 (Glass Decl.) ¶¶ 13–14.

All the factual allegations noted above meet the Due Process standard as well. "Specific jurisdiction is available when the cause of action sued upon arises out of the defendant's activities in a state." *Anderjaska v. Bank of Am., N.A.*, 2021 WL 877558, at *1 (S.D.N.Y. Mar. 9, 2021).  In her role as ChromaDiverse CEO, Tyrus made occasional visits to New York pursuant to her business

---

[10] Although the MLA states that it was executed in California, MLA ¶ 12, the New York Court of Appeals has made clear that conduct directed at New York, pursuant to a contract executed elsewhere, can be sufficient to exercise personal jurisdiction under Section 302(a)(1). *See State v. Vayu, Inc.*, 39 N.Y. 3d 330, 335 (2023) (finding the exercise of personal jurisdiction appropriate where the defendant sent communications into and visited New York pursuant to a "continuing business relationship"); *Presidential Realty Corp. v. Michael Sq. W.*, 44 N.Y.2d 672, 673 (1978) ("[T]he nature and purpose of a solitary business meeting conducted for a single day in New York may supply the minimum contacts necessary to subject a nonresident participant to the personal jurisdiction of our courts.").

relationship with DTH.  *Thomas Pub. Co. v. Indus. Quick Search, Inc.*, 237 F. Supp. 2d 489, 492–93 (S.D.N.Y. 2002) (noting relevance of "occasional visits to New York pursuant to business relationships" in personal jurisdiction analysis).  And DTH has proffered evidence—which Defendants do not refute—that Tyrus has used the Marbeth Collection images while fundraising for ChromaDiverse in New York state.  Glass Decl. ¶¶ 16–21.  All of this is sufficient for a finding of purposeful availment, consistent with the Due Process Clause of the U.S. Constitution.  *Brown*, 814 F.3d at 625.

In arguing that this Court should not exercise personal jurisdiction over Tyrus, Defendants cite *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984), for the proposition that Tyrus, a defendant who is "involved solely in her capacity as [a corporate] officer or director," is not subject to personal jurisdiction.  Defs.' Br. at 9.  Not so.  Although the *Keeton* Court held that jurisdiction is not "automatic" over a corporate officer, it also "reject[ed] the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity." 465 U.S. at 781 n.13. Defendants appear to be attempting to invoke the so-called "fiduciary shield" doctrine, whereby courts do not exercise personal jurisdiction over corporate officers for actions taken in their corporate role. But after *Keeton* was decided, the Supreme Court and the New York Court of Appeals explicitly rejected the fiduciary shield doctrine.  *Kinetic Instruments, Inc. v. Lares*, 802 F. Supp. 976, 982 n.2 (S.D.N.Y. 1992) (noting the Supreme Court's rejection, in *Calder v. Jones*, 465 U.S. 783, 791 (1984), of the doctrine under the Due Process Clause); *Kreutter v. McFadden Oil Corp.*, 71 N.Y. 2d 460, 470 (1988) (rejecting the doctrine under C.P.L.R. Section 302(a)).  It is thus appropriate for the Court to exercise specific personal jurisdiction over Tyrus in this case, even if she engaged in certain conduct in her corporate-fiduciary capacity.

### B.  The Court Will Not Exercise Personal Jurisdiction Over Gilbert or Gagnon

The closer question is whether the Court has personal jurisdiction over Gilbert and Gagnon. As with Tyrus and ChromaDiverse, this Court must find the exercise of specific personal jurisdiction

14

appropriate as to each Gilbert and Gagnon under Section 302 of the C.P.L.R.—the New York longarm statute—and the Due Process Clause. The Court concludes that it lacks personal jurisdiction over these two Defendants under both state and federal law.

DTH asserts that this Court has specific personal jurisdiction over Gagnon and Gilbert because of their role in the distribution of Schnare's property at the time of her death. It argues that by participating in that exercise at Schnare's New York apartment, Gagnon became a *de facto* trustee of Schnare's estate. DTH also argues that the Court has jurisdiction over Gilbert in her capacity as a co-executor of Schnare's estate. DTH asserts that this basis for jurisdiction is related to its claims against Gagnon and Gilbert because in their "roles in connection with Schnare's estate," they "falsely claimed to own the DTH Archive and transfer it to ChromaDiverse." Pl.'s Opp'n at 18.

The Court begins with Gagnon. According to the undisputed facts in her Declaration, she has resided in Arizona for 60 years, and has never lived or worked in New York. Gagnon Decl. ¶¶ 2–3. Although she "occasionally traveled to New York," she has not been to the state since she visited in the wake of Schnare's 2006 death. *Id.* ¶ 4. She no longer claims any interest in "any of the rights transferred to ChromaDiverse" in the Deed or Copyright Assignment, nor does she claim to have ever had an interest in any real property in New York. *Id.* ¶¶ 3, 12–13.

DTH nevertheless asserts that this Court has personal jurisdiction over Gagnon because she "joined" Euler—her mother and an executor of Schnare's estate—at Schnare's apartment to examine and distribute Schnare's property and "that portion of the DTH Archive then stored in Schnare's apartment." Pl.'s Opp'n at 17–18. In particular, Gagnon allegedly "agreed" that Fiotakis would take the Marbeth Collection photos and deliver them to DTH. According to DTH, this amounts to the "transaction of business in New York," permitting jurisdiction under the longarm statute and the Due Process Clause. Defendants respond that Gagnon's conduct is "exceedingly remote" and does not constitute "purposeful availment," a requirement for jurisdiction under the Due Process Clause. Dkt. No. 40 (Defs.' Repl.) at 2.

15

Beginning again with New York's longarm statute, the Court agrees with Defendants and concludes that it lacks personal jurisdiction over Gagnon. It is true that "[w]here a party acts like a trustee and assumes the duties of a trustee, that party will be considered a *de facto* trustee" under New York law. *In re Deyette*, 847 N.Y.S.2d 901, 901 (Sup. Ct. Nassau Cnty. 2007). In such circumstances, courts can exercise personal jurisdiction under C.P.L.R. § 302(a)(1) "in connection with issues arising from the [estate]," so long as the estate is located in New York. *Id.* DTH has not established, however, that Gagnon's role amounted to that of a *de facto* trustee. Indeed, DTH alleges that Gagnon's *mother* fully performed her duties as executor, agreeing on the proper disposition of the items in Schnare's apartment and signing paperwork in her capacity as the "sole" remaining executor, suggesting Gagnon never played any sort of *de facto* role. Compl. ¶ 44. Unlike in *Deyette*, on which DTH relies, there was no absence of trustees who "either wouldn't or couldn't" act as such, because DTH alleges that Euler fulfilled her role as Schnare's executor. 847 N.Y.S.2d at 901. There is thus no basis for specific personal jurisdiction over Gagnon under New York's longarm statute.

Nor has DTH established that the exercise of personal jurisdiction over Gagnon would be permissible under the Due Process Clause. Just as "physical presence alone cannot talismanically transform any and all business dealings into business transactions under C.P.L.R. 302," "[m]ere coincidental or fortuitous presence in New York when an agreement is entered into does not constitute purposeful availment of the benefits and protections of the state's laws" and is insufficient for personal jurisdiction under the Due Process Clause. *Lively v. Wayfarer Studios LLC*, 2025 WL 3085598, at *14 (S.D.N.Y. Nov. 5, 2025). DTH has alleged little more than Gagnon's "fortuitous presence" in Schnare's apartment while accompanying her mother. That is insufficient to justify the exercise of personal jurisdiction over her.

The Court next turns to Gilbert. According to her undisputed Declaration, she has resided in Arizona for over 50 years. Gilbert Decl. ¶¶ 1–2, 7–8. Though she is a former New York resident, Gilbert has not lived in the state since 1958, and has not visited since 2006. *Id.* ¶¶ 3, 5. Like Gagnon,

16

she no longer claims any interest in "any of the rights transferred to ChromaDiverse" in the Deed or Copyright Assignment, nor does she claim an interest in any real property in New York.  *Id.* ¶¶ 4, 12.

The Court also lacks personal jurisdiction over Gilbert.  Although Gilbert, unlike Gagnon, was initially named a co-executor of Schnare's estate, she renounced that role, and DTH does not allege that she took any action in that role before resigning.  Compl. ¶¶ 4, 40.  Indeed, DTH makes no allegation that Gilbert played any part whatsoever in the administration of Schnare's estate after her death.  The Court will not, therefore, exercise personal jurisdiction over Gilbert.[11]

### III.    Dismissal for Failure to State a Claim for Injurious Falsehood

DTH next brings an injurious falsehood claim against Tyrus and ChromaDiverse, alleging that they made "false statements to third parties" about and in "connection with" the San Francisco action, "in communications with *Dance Informa* magazine[,] in posts on Instagram[,] and in communications with customers, potential customers, or funders of ChromaDiverse."  Compl. ¶ 100.  As a result, DTH alleges that it "suffered pecuniary harm by virtue of being deprived of the value of licensing its intellectual property to third parties."  *Id.* ¶ 101.  For the reasons discussed below, DTH's injurious falsehood claim against Tyrus and ChromaDiverse is dismissed.

Under New York law, the tort of "[i]njurious falsehood, also known as 'trade libel,' consists of the knowing publication of false matter derogatory to the plaintiff's business of a kind calculated to

---

[11] DTH does not appear to argue that personal jurisdiction exists because Gagnon and Gilbert asserted ownership over New York-based property—namely, the photographs—in the Deed.  The presence of personal property in a state can—but does not necessarily—provide a basis from which a court may exercise personal jurisdiction. *Cf. Shaffer v. Heitner*, 433 U.S. 186, 208 n.25 (1977) (noting circumstances when the presence of an individual's personal property does not justify the exercise of personal jurisdiction).

Nonetheless, the Court need not decide this question, because DTH fails to state a claim for relief against Gagnon and Gilbert.  They no longer claim any legal interest in the Marbeth Collection, and, thus, there is no live case or controversy sufficient to sustain a declaratory judgment action against them. *Cf. Strongbow Holdings, LLC v. RMS Titanic, Inc.*, 2023 WL 4897393, at *7 (S.D.N.Y. Aug. 1, 2023) (no controversy exists when defendants "admit to no longer having any legal rights or interest" in personal property).  And, for the reasons discussed below, *infra* note 13, DTH fails to state a claim for injurious falsehood with respect to Gilbert and Gagnon as well.  In sum, even if the Court had found that there was personal jurisdiction over Gilbert or Gagnon, DTH's claims against them would nevertheless be dismissed.

17

prevent others from dealing with the business or otherwise interfering with its relations with others, to its detriment." *Bobulinski v. Tarlov*, 758 F. Supp. 3d 166, 181 (S.D.N.Y. 2024). "In addition to a statement denigrating the quality of the plaintiff's business's goods or services, a plaintiff must allege (1) falsity of the alleged statements; (2) publication to a third person; (3) malice; and (4) special damages." *Id.*

Defendants argue in their motion that DTH's injurious falsehood counts should be dismissed pursuant to Rule 12(b)(6) because DTH fails to properly state a claim for injurious falsehood against any Defendant. Specifically, Defendants argue that DTH (a) does not identify a statement by Tyrus or ChromaDiverse disparaging the quality of DTH's goods and services beyond statements of legal ownership, which Defendants argue are not actionable, and (b) fails to plead special damages with the requisite particularity.[12]

As a preliminary matter, DTH has not identified any caselaw suggesting that false statements of ownership can constitute actionable disparaging statements for the purposes of an injurious falsehood claim. In any event, DTH has not pleaded special damages. To do so, a party must allege "actual lost dealings" as a result of an injurious falsehood. *Banco Popular N. Am. v. Lieberman*, 905 N.Y.S.2d 82, 85 (1st Dep't 2010). They must also plead the amount of special damages with specificity. *Grayson v. Ressler & Ressler*, 271 F. Supp. 3d 501, 519 (S.D.N.Y. 2017). "The requirement of pleading . . . special damages is applied strictly." *Kasada, Inc. v. Access Cap., Inc.*, 2004 WL 2903776, at *16 (S.D.N.Y. Dec. 14, 2004). DTH alleges that it has lost its own opportunities to obtain licensing fees, but does not identify a specific lost opportunity or dollar amount. Compl. ¶ 101. To be sure, the Glass Declaration does identify particularized lost licensing opportunities. Glass Decl. ¶ 22. The Complaint itself, however, includes no "itemization" of damages beyond vague references to lost

---

[12] Defendants make an additional argument in their reply brief relating to the statute of limitations, but "[i]t is well settled . . . that an argument raised for the first time in a reply brief is waived." *Ctr. for Indep. of Disabled, N.Y. v. Metro. Transp. Auth.*, 2023 WL 5744408, at *6 (S.D.N.Y. Sept. 6, 2023). During oral argument, Defendants conceded that they had waived these arguments by failing to timely raise them. Oral Arg. Tr. 18:23–19:4.

third-party opportunities. *Drug Rsch. Corp. v. Curtis Pub. Co.*, 7 N.Y.2d 435, 441 (1960); *Espire Ads LLC v. TAPP Influencers Corp.*, 655 F. Supp. 3d 223, 260 (S.D.N.Y. 2023) ("Where the loss of customers constitutes the alleged special damages, the individuals who ceased to be customers, or who refused to purchase, must be named and the exact damages itemized."). And, although the Complaint does reference the lost opportunity to license the Marbeth Collection to ChromaDiverse itself, Compl. ¶ 107, it does not assign a dollar value to that lost opportunity—and when DTH previously licensed the Marbeth Collection to ChromaDiverse, it did so for nothing.

DTH argues that the special damages pleading standard should not apply because the specific lost opportunities are within ChromaDiverse's (and presumably Tyrus's) "peculiar knowledge." Pl.'s Opp'n at 26. The cases DTH points to, however, only support lowering heightened pleading standards in other contexts, such as fraud, and not in the speech-related tort context. *B. Garments (PVT), Ltd. v. Kids Int'l Corp.*, 2004 WL 444555, at *2 (S.D.N.Y. Mar. 10, 2004); *Jones v. E. Brooklyn Sec. Servs. Corp.*, 2012 WL 3235784, at *6 (E.D.N.Y. Aug. 7, 2012).

Lastly, relying on *Murphy-Higgs v. Yum Yum Tree, Inc.*, 112 F. App'x 796, 797 (2d Cir. 2004), DTH suggests that its legal fees incurred in litigating "this action" constitute "cognizable special damages." Pl.'s Opp'n at 26–27; Compl. ¶ 64. *Murphy-Higgs* does not provide the support that DTH suggests. Instead, the Second Circuit in that case upheld a district court's decision that legal fees did *not* constitute special damages because they were insufficiently connected to a libelous statement. *Murphy-Higgs*, 112 F. App'x at 797. To hold that legal fees incurred in bringing an injurious falsehood lawsuit can themselves qualify as the required special damages would undermine that element of the tort, and there is no support for doing so in the case law. Accordingly, the injurious falsehood claim is dismissed.[13]

---

[13] Even if the Court were to exercise personal jurisdiction over Gilbert and Gagnon, this claim would similarly fail as to them as well.

**CONCLUSION**

For the foregoing reasons, the motion is granted in part and denied in part. The Court denies the motion for transfer or a stay. It grants the motion to dismiss for lack of personal jurisdiction, as to Gilbert and Gagnon, but denies it as to Tyrus and ChromaDiverse. Finally, it dismisses Count IV against Tyrus and ChromaDiverse. If DTH seeks leave to amend the Complaint, it may do so within thirty (30) days, so long as it has a good-faith basis to do so. The Clerk of Court is respectfully directed to close the motion pending at Docket Number 21.

SO ORDERED.

Dated:    March 31, 2026
          New York, New York

Ronnie Abrams
United States District Judge

20